**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION**

JERRY BARNES,

     Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA and UNUM GROUP CORP.,

     Defendants.

Civil Action No.

## COMPLAINT FOR RECOVERY OF PLAN BENEFITS AND FOR THE ENFORCEMENT OF RIGHTS UNDER ERISA

Plaintiff, Jerry Barnes, (hereinafter "Mr. Barnes") makes the following representations to the Court for the purpose of obtaining relief from Defendants' refusal to pay Long-Term Disability ("LTD") benefits due under an employee benefits plan and for Defendants' other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"):

## JURISDICTION AND VENUE

1.     This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1337 and 29 U.S.C. § 1132(e) (ERISA § 502(e)). Mr. Barnes's claims "relate to" an "employee welfare benefits plan" as defined by ERISA, 29 U.S.C. § 1001 et seq., and the subject employee welfare benefit plan constitutes a "plan under ERISA."

2.     The ERISA statute, at 29 U.S.C. § 1133, as well as Department of Labor regulations, at 29 C.F.R. § 2560.503-1, provide a mechanism for administrative or internal appeal of benefits denials. In this case, those avenues of appeal have been exhausted, and this matter is now properly before this Court for judicial review.

1

3. Venue is proper within the Eastern District of Tennessee pursuant to 29 U.S.C. § 1132(e)(2).

## PARTIES

4. Mr. Barnes was at all relevant times and is currently a resident of Ouachita Parish, Louisiana.

5. Defendant Unum Life Insurance Company of America ("Unum Life") is the underwriter of group LTD insurance policy number 470517 (Exhibit 1), issued to Plaintiff's former employer, The Woman's Clinic, and is the party obligated to pay benefits and to determine eligibility for LTD benefits under the Plan.

6. Unum Life is an insurance company authorized to transact the business of insurance in this state and may be served with process through the Commissioner of the Tennessee Department of Commerce and Insurance, 500 James Robertson Parkway, Suite 660, Nashville, Tennessee 37243-1131.

7. Defendant Unum Group Corporation ("Unum Group") is the parent company of Unum Life. (Hereinafter collectively referred to as "Unum").

8. Unum Group exercises significant control over the policies and actions of Unum Life.

9. Unum Group is the employer of all persons who acted on behalf of Unum Life.

10. Unum Group may be served with process by and through its registered agent for service, Corporation Service Company, 2908 Poston Avenue, Nashville, TN 37203.

## FACTS

11. Mr. Barnes was employed by The Woman's Clinic as Chief Executive Officer.

12.     The Woman's Clinic maintained an LTD benefits plan ("the Plan") for the benefit of its employees.

13.     LTD benefits under the Plan were funded by Unum Life policy number 470517.

14.     Mr. Barnes is a participant or beneficiary of the Plan and is covered by the Policy that provides LTD benefits under the Plan.

15.     Mr. Barnes ceased work due to a disability on July 11, 2017, while covered under the Plan.

16.     Mr. Barnes suffers from numerous conditions, including disc herniation, lumbar spondylosis, degenerative disc disease, and residual effects from his prostate cancer and its treatment.

17.     Mr. Barnes's back-related conditions are inoperable due to osteopenia resulting from radiation for prostate cancer.

18.     Mr. Barnes's prostate cancer treatments led to nerve damage that causes severe hip and anal pain which prohibits sitting for extended periods of time.

19.     Mr. Barnes also has post-cancer nerve issues in both of his legs.

20.     Dr. Robert Goodman, Mr. Barnes's treating rheumatologist, has diagnosed him with inflammatory polyarthropathy, osteoarthritis, osteopenia, spinal stenosis, and peripheral neuropathy.

21.     Mr. Barnes' treating neurosurgeon, Dr. Marshall Cain, has diagnosed Mr. Barnes with nerve entrapment, enlarged nerve root, lumbar spondylosis, degenerative disc disease, osteopenia, and degenerative neurological deficits which cause back, hip, and anal pain.

22.     Dr. John Stockstill, Mr. Barnes's treating family medicine physician, has diagnosed Mr. Barnes with degenerative disc disease, hip pain, coronary artery disease, hypertension, and diabetes.

23.     Due to his many medical conditions, including those alleged above, Mr. Barnes has been and continues to be disabled as defined by the provisions of the Plan.

24.     On September 13, 2017, Mr. Barnes timely filed an application for LTD benefits under the Plan.

25.     On October 9, 2017, Unum approved that application and began paying LTD benefits.

26.     On May 3, 2018, Unum had its family medicine physician, Dr. James Haller, review Mr. Barnes's medical records.

27.     Despite having never examined Mr. Barnes in person, Dr. Haller concluded that Mr. Barnes had no restrictions or limitations and was not disabled as defined by the Plan.

28.     On May 3, 2018, Dr. Haller sent a letter outlining his opinion to Mr. Barnes's treating neurosurgeon, Dr. Robert Cain.  Dr. Haller asked Dr. Cain whether Dr. Cain agreed or disagreed with Dr. Haller's finding of no restrictions or limitations.

29.     By letter dated May 16, 2018, Dr. Cain disagreed with Dr. Haller's opinion and stated that Mr. Barnes's back pain, hip pain, anal pain, intense nerve pain, weakness, balance issues, and uncontrolled high blood pressure prevent him from returning to any type of work.

30.     Dr. Cain further explained in his May 16, 2018, letter that Mr. Barnes has progressive diseases and is therefore unlikely to ever be able to return to work.

31.     In response to Dr. Haller's critique of the fact that Mr. Barnes did not have recent MRIs, Dr. Cain explained that he did not think it appropriate to expose Mr. Barnes, a cancer

4

survivor, to additional radiation by conducting MRIs that are unnecessary since Mr. Barnes's conditions are degenerative and will not improve.

32.     Dr. Haller's May 3, 2018, letter also opined that the fact that Mr. Barnes was taking a stable dose of opiates indicates he did not have degenerative conditions.  Dr. Cain explained that Mr. Barnes's opiate prescription had in fact been increased to five doses per day.

33.     Despite Dr. Cain's letter, Dr. Haller issued a second report on May 16, 2018, which again opined that Mr. Barnes had no restrictions or limitations and was not disabled under the terms of the Plan.

34.     By letter dated July 2, 2018, Unum terminated Mr. Barnes's LTD benefits.

35.     Mr. Barnes requested a reconsideration of Unum's denial on August 17, 2018.

36.     With this request for reconsideration, Mr. Barnes submitted letters from numerous doctors supporting his disability—a  letter dated August 2, 2018, from his treating rheumatologist, Dr. Goodman; a letter dated August 9, 2018, from Dr. Cain, his treating neurosurgeon; a letter dated August 15, 2018, from Dr. Stockstill, his treating family medicine physician; a letter dated August 15, 2018, from Dr. Wagner, his treating physical therapist; and a letter from Dr. Sampognaro, his treating cardiologist.

37.     Despite this additional evidence, Unum's Dr. Haller again opined that Mr. Barnes had no restrictions or limitations in a report dated September 10, 2018.

38.     By letter dated September 18, 2018, Unum confirmed its denial of Mr. Barnes's LTD benefits.

39.     Mr. Barnes retained counsel and appealed Unum's termination of his benefits by letter dated December 28, 2018.

40.     With this appeal, through counsel, Mr. Barnes submitted psychiatrist Dr. Patrick Sewell's October 18, 2018, letter which explained that Mr. Barnes has Major Depression, Post-Traumatic Stress Disorder, Generalized Anxiety Disorder, and "severe medical difficulties that are affecting his psychological state." Dr. Sewell stated that these diagnoses "in sum make his life extremely difficult. I do consider Mr. Barnes complete[ly] disabled."

41.     Mr. Barnes also submitted Dr. Sewell's Assessment of Mental Limitations dated October 18, 2018, which states that Mr. Barnes has no ability to perform activities of daily living independently and appropriately, free of supervision or direction; no capacity to interact appropriately, communicate effectively, and engage in functioning; no abilities of concentration, persistence, and pace; no ability to adapt to stressful circumstances in work or work-like settings where failure to adapt results in repeated episodes of deterioration or decompensation which cause the patient to withdraw or to experience an exacerbation of symptoms; no ability to follow work rules; no ability to deal with the public; no ability to deal with the stress of ordinary work; no ability to demonstrate reliability; no ability to persist at assigned tasks; no ability to relate to supervisors and co-workers; no ability to work at a consistent pace for acceptable periods of time; and no ability to timely complete tasks commonly found in work settings.

42.     Mr. Barnes submitted the transcript of Dr. Cain's sworn statement conducted on November 15, 2018, in which Dr. Cain explained his extended treatment of Mr. Barnes and reiterated his assessment that Mr. Barnes is disabled.

43.     In this sworn statement, Dr. Cain opined that Mr. Barnes cannot sit for more than fifteen minutes at a time, which prevents him from performing sedentary work that requires the ability to sit for most of the day.

6

44.     Mr. Barnes also submitted Dr. Cain's Medical Opinion Form dated December 12, 2018, that states that Mr. Barnes is incapable of even sedentary work.

45.     Mr. Barnes submitted an objective Functional Capacity Assessment conducted on November 19, 2018, that found Mr. Barnes has no safe work capacity.

46.     Mr. Barnes submitted Dr. James Stockstill's Medical Opinion Form dated December 4, 2018, in which Dr. Stockstill opined that the combination of Mr. Barnes's conditions lead to impairments that include being restricted to only sitting for fifteen minutes at a time; lifting one to five pounds only occasionally, one-third of the day; requiring two hours of bed rest per eight-hour workday; not being able to reliably attend a forty-hour work week; experiencing lapses in concentration and memory multiple days a week due to his conditions; and being able to perform fine manipulation, typing, writing, and grasping small objects less than one-third of the day.

47.     On January 7, 2019, and again on January 28, 2019, Mr. Barnes submitted additional evidence supporting his entitlement to LTD benefits under the terms of the Plan.

48.     This additional evidence included a letter from Prudential Insurance dated January 16, 2018, approving Mr. Barnes for LTD benefits under a substantially similar definition of disability.

49.     Similarly, Mr. Barnes submitted a letter from the Social Security Administration stating that he had become disabled under Social Security's definition of disability as of July 11, 2017, under a more stringent definition of disability than the Unum LTD Plan.

50.     Mr. Barnes also submitted a Medical Opinion Form dated January 23, 2019, from Dr. John Ledbetter, Mr. Barnes's pain management physician, which states that he requires two

7

hours of bedrest per day, suffers from severe pain, and has a reasonable medical need to be chronically absent from work, among other restrictions.

51.     In response to Dr. Sewell's opinion that Mr. Barnes's psychiatric conditions prevent him from working, Unum had its on-site psychiatrist, Dr. Peter Brown, review Mr. Barnes's psychiatric records.

52.     Dr. Brown never examined or evaluated Mr. Barnes in person.

53.     Dr. Peter Brown was instructed to discuss Mr. Barnes's psychiatric conditions with Dr. Sewell.

54.     Despite never speaking with Dr. Sewell, Dr. Brown concluded in a report dated March 12, 2019, that Mr. Barnes's psychiatric conditions do not cause any restrictions or limitations.

55.     Dr. Brown based his conclusion in part on the fact that Mr. Barnes's psychiatric treatment was limited.

56.     The Plan gives Unum the right to send Mr. Barnes to a psychiatric evaluation.

57.     Unum choose not to utilize this right and did not send Mr. Barnes to a psychiatric evaluation.

58.     Unum had its on-site family medicine doctor, Dr. Scott Norris, review Mr. Barnes's medical records.

59.     Dr. Norris never examined or evaluated Mr. Barnes in person.

60.     Despite the opinions of Mr. Barnes's numerous treating physicians that he is incapable of sedentary work, Dr. Norris concluded that Mr. Barnes was not restricted from sedentary work from July 2, 2018, forward.

61. Dr. Norris was instructed to discuss Mr. Barnes's physical conditions with Dr. Stockstill if Dr. Norris disagreed with the opinions of Mr. Barnes's treating providers.

62. Dr. Norris never discussed Mr. Barnes's conditions with Dr. Stockstill.

63. Instead, Dr. Norris sent Dr. Stockstill a form asking whether Dr. Stockstill agreed with Dr. Norris's opinion that Mr. Barnes had the capacity to perform full-time sedentary level occupational activity as of July 2, 2018.

64. Dr. Stockstill checked the box indicating that he deferred to other treating providers.

65. Based on Dr. Stockstill deferring to Mr. Barnes's other specialized treating providers, Dr. Norris concluded that restrictions and limitations were not supported for physical conditions.

66. Dr. Norris made no attempts to contact Dr. Robert Goodman, Mr. Barnes's treating rheumatologist, whose opinion supported Mr. Barnes's entitlement to benefits.

67. Dr. Norris made no attempts to contact Dr. Marshall Cain, Mr. Barnes's treating neurosurgeon, whose opinion supported Mr. Barnes's entitlement to benefits.

68. Dr. Norris made no attempts to contact Dr. Sampognaro, Mr. Barnes's treating cardiologist, whose opinion supported Mr. Barnes's entitlement to benefits.

69. Dr. Norris made no attempts to contact Dr. Elizabeth Wagner, Mr. Barnes's treating physical therapist, whose opinion supported Mr. Barnes's entitlement to benefits.

70. Dr. Norris made no attempts to contact Dr. Michael Harvey, Mr. Barnes's treating chiropractor, whose opinion supported Mr. Barnes's entitlement to benefits.

71. Dr. Norris made no attempts to contact Dr. John Ledbetter, Mr. Barnes's treating pain management doctor, whose opinion supported Mr. Barnes's entitlement to benefits.

9

72.     In response to the November 19, 2018, functional capacity assessment, Dr. Norris claimed that Mr. Barnes's "reported level of pain during the testing was inconsistent with the observed behaviors during the FCE."

73.     The functional capacity assessment report contains no statement that Mr. Barnes's was magnifying his symptoms.  Rather, Enrique Colon, the Exercise Physiologist who conducted the functional capacity assessment, states variously:

> a)     that it is his "opinion that the results of this assessment are a true indication of Mr. Barnes's present physical abilities" (p. 2);
>
> b)     that, "Mr. Barnes provided consistent effort throughout the Functional Capacity Assessment" (p. 4).
>
> c)     that the assessment is a true indication of Mr. Barnes's present physical abilities (p. 4); and
>
> d)     that, "Based on the documented physiological and biomechanical changes it is our opinion that Mr. Jerry Barnes did provide a maximal acceptable effort during the ELC evaluation." (p. 13).

74.     By letter dated April 2, 2019, Unum again confirmed its denial of Mr. Barnes's LTD benefits.

75.     The April 2, 2019, letter confirmed that Mr. Barnes had exhausted his administrative remedies and had a right to bring a lawsuit under ERISA § 502(a) to challenge the denial of his benefits.

76.     Unum would pay any LTD benefits due out of its own funds.

77.     Unum owed Mr. Barnes duties as a fiduciary of the ERISA Plan, including the duty of loyalty.

10

78. Unum was under a perpetual conflict of interest because Mr. Barnes's benefits would have been paid out of its own funds.

79. Unum allowed its concern over its own funds to influence its decision-making.

80. When Unum denies a claim before all of the contractual benefits are paid, Unum internally refers to that as a "recovery".

81. Unum's conflict of interest and bias is evidenced by the fact that it establishes monthly financial targets that are reached by denying claims whose monetary reserve amounts would cumulatively meet those targets.

82. The monthly financial targets for denying claims are called "recovery plans" or similar words.

83. The monthly targets, or "recovery plans," include the dollar amounts to be reached in terms of reserves on denied or "recovered" claims and the count of total claims that should be recovered.

84. These recovery plans are given by Vice Presidents (often through the Vice President's administrative assistant) in the claims department to the Assistant Vice Presidents in writing and verbally.

85. The Vice Presidents also give the Assistant Vice Presidents a list of claims that have been identified as potential recoveries. This list includes the names of individual insureds and the reserve amount associated with the claims of those insureds.

86. The list of claims that are potential recoveries, including the reserve amounts, is transferred from the Vice Presidents to the Assistant Vice Presidents by hard copy paper.

11

87. The recovery plans and the list of potentially recoverable claims provided to the Assistant Vice Presidents are disseminated by the Assistant Vice Presidents to the Directors they supervise and are used by the Assistant Vice Presidents to coach or supervise their Directors.

88. Directors at Unum are the employees who ultimately make the decision to approve or deny claims for benefits.

89. The recovery plans and the list of potentially recoverable claims that are given to the Assistant Vice Presidents are passed on to Directors verbally, so there will be no record of the Directors being told their monthly financial targets of "recoveries" or denied claims.

90. After the Assistant Vice Presidents pass on the recovery plans and the list of potentially recoverable claims to the Directors, the Assistant Vice Presidents shred the documents that contained the names of individual insurers and their reserve amounts.

91. The Directors use this information, and the targeted financial amounts, to guide them and the claims handlers under them to deny meritorious claims in order to meet the recovery plan for their team.

92. To receive bonuses under Unum's incentive program, Unum's employees are evaluated against certain criteria, which include planned claim terminations, expected liability acceptance rates, and anticipated reopen rates. (Exhibit 2, ID Director Scorecards).

93. Internal documents reveal that targets and goals for claim closures are set at the unit level and that there are goals set for open claim recoveries (denying an open claim) per day. (Exhibit 3, Weekly Tracking Reports).

94. In his recent deposition, Anthony Scuderi—who was an Assistant Vice President with Unum—confirmed that Unum continues to target individual claims for their value— testifying that his supervising Vice President would provide him with printed sheets that

included the names and financial reserve value of claimants each month; he would copy the information in those sheets onto a spreadsheet on his personal computer; he would then verbally disseminate that information to the Directors he supervised; he would shred the paper document; and he would report back to his supervising Vice President periodically on the progress of meeting the "paid recovery" metric. (Exhibit 4, selected excerpts from the deposition of Anthony Scuderi). He testified that he believed this was the common practice of all Unum's Assistant Vice Presidents. *See Id.*

95.     Unum's claims and appeals units were provided the targets for claim closures and uphold decisions and then were provided the specific claims that would meet those expectations.

96.     Paul Peter, another former Assistant Vice President for Unum, testified that he received the recovery plan each month from his supervising Vice President, Maureen Griffin, and that he passed this information down to the Directors he supervised. (Exhibit 5, selected excerpts from the deposition of Paul Peter). Paul Peter also testified that he received the list of claims that were identified as potential recoveries, which included the names of the claimants and the reserve amount associated with each claim. *See Id.* Paul Peter confirmed that he and the Directors he supervised were graded and held accountable for meeting the "recovery plan," and he impressed upon his Directors the importance of meeting the planned numbers. *See Id.* at 29-30.

97.     Unum's targeting of Plaintiff's claims for denial taints all evidence it developed during the review of his claims as the review was designed to reach the result of a denial, not an impartial weighing of the evidence.

98.     Unum breached its fiduciary duties to Plaintiff, including the duty of loyalty.

13

## FIRST CAUSE OF ACTION
## FOR PLAN BENEFITS AGAINST THE DEFENDANT
## PURSUANT TO 29 U.S.C. §§ 1132(a)(1)(B)

Mr. Barnes incorporates the allegations contained in the prior paragraphs as if fully stated herein and further states:

99. Under the terms of the Plan, Unum agreed to provide Mr. Barnes with LTD benefits in the event that he became disabled as defined by the Plan.

100. Mr. Barnes is disabled and entitled to benefits under the terms of the Plan.

101. Unum failed to provide benefits due under the terms of the Plan, and these denials of benefits to Mr. Barnes constitute breaches of the Plan.

102. The decisions to terminate benefits were wrong under the terms of the Plan.

103. The decisions to terminate benefits and decision-making processes were arbitrary and capricious.

104. The decisions to deny benefits were not supported by substantial evidence in the record.

105. As a direct and proximate result of Unum's failure to provide benefits for Mr. Barnes's disability, Mr. Barnes has been damaged in the amount equal to the amount of benefits to which he would have been entitled under the Plan.

106. As a direct and proximate result of Unum's failure to provide benefits for Mr. Barnes's disability, Mr. Barnes has suffered, and will continue to suffer in the future, damages under the Plan, plus interest and other damages, for a total amount to be determined.

## PRAYER FOR RELIEF

Mr. Barnes requests that this Court grant him the following relief in this case:

1. A finding in favor of Mr. Barnes against Unum;

14

2. Damages in the amount equal to the disability income benefits to which he is entitled through date of judgment, for unpaid benefits pursuant to 29 U.S.C. § 1132(a)(1)(B);

3. Prejudgment and postjudgment interest;

4. An Order requiring the Plan or appropriate Plan fiduciary to pay continuing benefits in the future so long as Mr. Barnes remains disabled under the terms of the Plan.

5. An Order requiring the Plan or the appropriate Plan fiduciary to provide Mr. Barnes with any other employment benefits to which he would be entitled pursuant to a finding that he is disabled under the Plan or under any other employee welfare benefit plan;

6. Mr. Barnes's reasonable attorneys' fees and costs; and

7. Such other relief as this Court deems just and proper.

Mr. Barnes further requests that the Court order Unum to provide to Mr. Barnes with a bound copy of the ERISA record consecutively paginated.

Dated May 8, 2019.


Respectfully submitted,


ERIC BUCHANAN & ASSOCIATES, PLLC
ATTORNEYS FOR PLAINTIFF


BY:  */s/ Hudson T. Ellis*_____
Hudson T. Ellis (BPR #28330)
414 McCallie Avenue
Chattanooga, TN 37402
(423) 634-2506
FAX:  (423) 634-2505